**Gordon K. HIRABAYASHI,**
**Petitioner-Appellant,**

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

**Gordon K. HIRABAYASHI,**
**Petitioner-Appellee,**

v.

**UNITED STATES of America,**
**Respondent-Appellant.**

**Nos. 86–3853, 86–3887.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 1987.

Decided Sept. 24, 1987.

Rodney L. Kawakami, Kathryn Bannai, Arthur G. Barnett, Jeffrey A. Beaver, Camden M. Hall, Daniel J. Ichinaga, Gary D. Iwamoto, Craig T. Kobayashi, Michael Leong, Nina L. Mar, Karen Narasaki, Sharon A. Sakamoto, Roger H. Shimizu, Benson D. Wong, Seattle, Wash., for petitioner/appellee/cross-appellant.

Victor D. Stone, Washington, D.C., for respondent/appellee/cross-appellant.

Before GOODWIN, SCHROEDER and FARRIS, Circuit Judges.

SCHROEDER, Circuit Judge:

## I. INTRODUCTION

Gordon Hirabayashi is an American citizen who was born in Seattle, Washington, in 1918, and is currently Professor Emeritus of Sociology at the University of Alberta. He is of Japanese ancestry. In 1942 he was living in Seattle and was therefore subject to wartime orders requiring all persons of Japanese ancestry, whether citizens or not, to remain within their residences between 8:00 p.m. and 6:00 a.m. He was also subject to subsequent orders to report to a Civilian Control Station for processing requisite to exclusion from the military area. Hirabayashi refused to honor the curfew or to report to the control station because he believed that the military or-

ders were based upon racial prejudice and violated the protection the Constitution affords to all citizens. The Supreme Court reviewed his conviction for violating the curfew order and unanimously affirmed. In an opinion by Chief Justice Stone, the Court accepted the government's position that the curfew was justified by military assessments of emergency conditions existing at the time. *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Because Hirabayashi had received a concurrent sentence for violating the exclusion order, the Court affirmed that conviction as well. *Id.* at 105, 63 S.Ct. at 1387. The following year, a majority of what was by then a sharply divided Court applied the same military emergency rationale to uphold explicitly the exclusion of all citizens of Japanese ancestry from the West Coast. *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

The *Hirabayashi* and *Korematsu* decisions have never occupied an honored place in our history. In the ensuing four and a half decades, journalists and researchers have stocked library shelves with studies of the cases and surrounding events. These materials document historical judgments that the convictions were unjust. They demonstrate that there could have been no reasonable military assessment of an emergency at the time,[1] that the orders were based upon racial stereotypes,[2] and that the orders caused needless suffering and shame for thousands of American citizens.[3] The legal judgments of the courts reflecting that Hirabayashi and Korematsu had been properly convicted of violating the laws of the United States, however, remained on their records. Petitioner filed this lawsuit in 1983 to obtain a writ of error *coram nobis* to vacate his convictions and thus to make the judgments of the courts conform to the judgments of history.

The event which triggered the lawsuit occurred in 1982, when an archival researcher discovered the sole remaining copy of the original report prepared by the general who issued the curfew and exclusion orders. This report was intended to explain the basis for those orders. War Department officials revised the report in several material respects and tried to destroy all of the original copies before issuing the final report. The Justice Department did not know of the existence of the original report at the time its attorneys were preparing briefs in the *Hirabayashi* and *Korematsu* cases.

In his *coram nobis* petition Hirabayashi contended that the original report, the circumstances surrounding its alteration, and recently discovered related documents provided the proof, unavailable at the time of his conviction, that the curfew and exclusion orders were in fact based upon racial prejudice rather than military exigency. Hirabayashi further alleged that the government concealed these matters from his counsel and the Supreme Court, and that had the Supreme Court known the true basis for the orders, the ultimate decision in the case would probably have been different.

The district court held a full evidentiary proceeding on Hirabayashi's claims. It reviewed hundreds of documents and heard the testimony of several witnesses. They included Edward Ennis, who had been the Director of the Alien Enemy Control Unit at the Department of Justice and a principal author of the government's briefs in

---

1. *See, e.g.,* P. Irons, *Justice at War* (1983); R. Daniels, *The Decision to Relocate the Japanese Americans* (1975); M. Grodzins, *Americans Betrayed* (1949); Yamamoto, *Korematsu Revisited—Correcting the Injustice of Extraordinary Government Excess and Lax Judicial Review: Time for a Better Accommodation of National Security Concerns and Civil Liberties,* 26 Santa Clara L.Rev. 1 (1986).

2. *See, e.g.,* A. Fisher, *Exile of a Race* (1970); C. McWilliams, *Prejudice* (1944); Rostow, *The Japanese American Cases—A Disaster,* 54 Yale L.J. 489 (1954); Dembitz, *Racial Discrimination and the Military Judgment: The Supreme Court's Korematsu and Endo Decisions,* 45 Colum.L. Rev. 175 (1945).

3. *See, e.g.,* R. Daniels, S. Taylor & H. Kitano, *Japanese Americans: From Relocation To Redress* (1986); M. Weglyn, *Years of Infamy* (1976); D. Myer, *Uprooted Americans* (1971).

both the *Hirabayashi* and *Korematsu* cases; William Hammond, who had been the Assistant Chief of Staff for the entire Western Defense Command; Aiko Herzig-Yoshinaga, a researcher for the Commission on Wartime Relocation and Internment of Civilians from 1981 to 1983 and the person who discovered the original version of the final report.

In a careful opinion containing detailed findings of fact, the district court confirmed Hirabayashi's contentions in virtually every factual respect. *See Hirabayashi v. United States*, 627 F.Supp. 1445 (W.D. Wash.1986). It rejected as factually and legally unsupported the government's arguments that Hirabayashi had not been prejudiced by the concealment of the newly discovered material, that Hirabayashi could and should have made the same claims years earlier, and that there was no remaining case or controversy because Hirabayashi suffered no continuing adverse consequences from the original convictions.

The district court held that Hirabayashi's conviction for violating the exclusion order resulted in a violation of due process and ordered it vacated. 627 F.Supp. at 1457. Another district court has reached the same result in the *Korematsu* case, *Korematsu v. United States*, 584 F.Supp. 1406 (N.D.Cal.1984), and there has been no appeal.[4] The district court in this case, however, concluded as a matter of law that the curfew conviction should not be vacated. It ruled that because the curfew order less significantly infringed Hirabayashi's freedom, the Supreme Court would have distinguished it from the exclusion order and would have affirmed the conviction even if

it had known the racial basis of the order. *Hirabayashi*, 627 F.Supp. at 1457.

Both Hirabayashi and the government appeal. In reviewing the district court's decision, we must uphold the findings of fact unless they are clearly erroneous, and review the legal issues de novo. *United States v. McConney*, 728 F.2d 1195, 1200 n. 5 & 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We agree with the district court's factual and legal analysis leading to its vacation of the exclusion conviction. We disagree with the court's conclusion that the curfew conviction rests upon a legal foundation different from the exclusion conviction. We therefore hold that both convictions should be vacated.

## II. FACTUAL BACKGROUND

This proceeding is a collateral attack upon convictions for violating military orders promulgated in 1942. The facts underlying this litigation thus form a very small part of the great mosaic of American participation in World War II. In order to resolve the contentions of both parties on appeal, we must first understand the nature and origin of the crimes of which the petitioner was convicted; the posture of the case as it was presented to the United States Supreme Court; the material which the government suppressed from the Court; and the relevance of that material to the Supreme Court's analysis.

### A. *The Military Exclusion Orders and Hirabayashi's Conviction.*

On December 7, 1941, President Roosevelt issued Presidential Proclamation

---

**4.** Hirabayashi's case was one of three wartime Japanese internment cases in which the Supreme Court upheld the government's orders. Fred Korematsu violated a California exclusion order in May 1942, approximately the same time as Hirabayashi. Because of an intervening jurisdictional problem which was certified to the Supreme Court, we did not address the merits of his appeal until December 1943. *Korematsu v. United States*, 140 F.2d 289 (9th Cir. 1943). Thus, his conviction was not affirmed by the Court until a year and a half after the *Hirabayashi* decision. The Court also affirmed Minoru Yasui's conviction for violating an Oregon curfew order. The Court handed down its

decisions in *Hirabayashi* and *Yasui* on the same day. *Yasui v. United States*, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793 (1943). In February 1983 Yasui filed a petition for *coram nobis* relief, which was dismissed by the district court upon the government's motion to dismiss the indictment and vacate the conviction. We held that Yasui's appeal was untimely and remanded the case to allow Yasui to make a showing of excusable neglect. *Yasui v. United States*, 772 F.2d 1496, 1499–1500 (9th Cir.1985). Although we specifically retained jurisdiction over the appeal, it was subsequently dismissed as moot due to Yasui's death.

No. 2525, *reprinted in* H.R.Rep. No. 2124, 77th Cong., 2d Sess. (1942); R. Daniels, *supra* note 1, at 61, delegating broad authority to the Attorney General and the Secretary of War to promulgate and enforce regulations aimed at curtailing the liberties of enemy aliens following the declaration of war against Japan, Italy, and Germany. A subject of immediate governmental internal debate was whether or not our Constitution permitted similar action with respect to citizens, and specifically, whether or not the evacuation of citizens of Japanese ancestry from the West Coast was appropriate. The Justice Department consistently took the view that civilian authorities could not authorize the exclusion of citizens and that the matter should be left to military judgment.[5]

Consistent with that view, President Roosevelt signed Executive Order No. 9066 on February 19, 1942. It authorized the Secretary of War or his designees to prescribe military areas from which any or all persons, citizens as well as aliens, might be excluded. Exec. Order No. 9066, 3 C.F.R. 1092 (1938–1943 Comp.). The next day, Secretary of War Stimson delegated his authority under the Executive Order to Lt. Gen. John L. DeWitt, the Commanding General of the Western Defense Command. On March 2, 1942, General DeWitt issued Public Proclamation No. 1, designating "Military Areas" within the western states. 7 Fed.Reg. 2320 (1942). On March 21, President Roosevelt signed legislation making it a misdemeanor to disregard restrictions imposed by a military commander. Pub.L. No. 77–503, 56 Stat. 173 (1942).

Based upon the authority of the Executive Order and the criminal statute, General DeWitt began issuing orders requiring certain persons to obey curfew restrictions and report at designated times and places for evacuation from military areas. Two of these orders provided the basis for Hirabayashi's convictions.

In Public Proclamation No. 3, dated March 24, 1942, General DeWitt proclaimed "as a matter of military necessity" that all German and Italian aliens and all persons of Japanese ancestry, whether aliens or American citizens, within established military zones would be required beginning March 28, 1942, to remain within their place of residence between 8 p.m. and 6 a.m. 7 Fed.Reg. 2543. That same day, General DeWitt began issuing a series of Civilian Exclusion Orders, each relating to a specified area within the territory of his command. Order No. 57, pertaining to Seattle, issued May 10, 1942, required the petitioner to report either May 11 or May 12 to a designated civilian control station as a prerequisite to exclusion from the military area on May 16. 7 Fed.Reg. 3725. Hirabayashi went instead to the FBI where he volunteered that he had not abided by the curfew restrictions and that he, as a matter of conscience, would not register with the civilian control station. Hirabayashi's actual loyalty to this country has apparently never been questioned before, during or since World War II.[6]

A grand jury indicted petitioner on May 28, 1942. Count I charged that he had failed to report pursuant to Civilian Exclusion Order 57. Count II charged the curfew violation. He was tried by a jury in October 1942, found guilty, and sentenced to three months on each count to be served concurrently.[7] On appeal, this court certified issues to the Supreme Court, and the Supreme Court on April 5, 1943, certified

---

**5.** *See, e.g.,* Letter of February 12, 1942, from Attorney General Biddle to Secretary of War Stimson *reprinted in* R. Daniels, *supra* note 1, at 107–08; Letter of January 4, 1942, from Assistant to the Attorney General Rowe to General DeWitt, *quoted in* M. Grodzins, *supra* note 1, at 238.

**6.** Hirabayashi was born in the United States. His parents were born in Japan, but came to the United States in the early 1900s at the age of 19. They were married in this country and never returned to Japan. Hirabayashi had never been to Japan and had never even corresponded with anyone there. *See Hirabayashi,* 627 F.Supp. at 1447 (detailing petitioner's personal background, education, community activities, etc.)

**7.** Hirabayashi's three month sentence was served after the Supreme Court affirmed his convictions. He had already been incarcerated for nine months; five pending trial and four more pending appeal before bail terms were agreed upon.

the entire record to it. *Hirabayashi*, 320 U.S. at 84–85, 63 S.Ct. at 1378.

### B. *The Supreme Court Proceedings.*

Briefing to the Supreme Court took place in the spring of 1943. In his brief, Hirabayashi argued that there was no emergency justifying a racially based classification and that the orders had been issued upon invidious racial prejudice. For example, Hirabayashi's brief stated:

> Whatever may have been the panicky notion about a Japanese invasion of the West Coast right after Pearl Harbor, it was quite evident by the time the orders here in question were promulgated that the Japanese were not easily going to be able to do this. They had not invaded Australia; had not even attacked Hawaii a second time. [footnote omitted] The picture of Japanese paratroops hiding among the Japanese residents of the West Coast to assist at an invasion is pure fantasy. The truth of the matter is that there was no military necessity, nor even reasonable ground for belief that such necessity required either general curfew regulations or wholesale evacuation orders.

Brief for Appellant at 19, *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (No. 870).

The Justice Department justified the exclusion and curfew orders upon what it said was a reasonable judgment of military necessity. It argued that because of cultural characteristics of the Japanese Americans, including religion and education, it was likely that some, though not all, American citizens of Japanese ancestry were disloyal. Brief for United States at 18–32. It then argued that because of the military exigencies, the government did not wait to segregate the loyal from the disloyal. The government's brief stated:

> The classification was not based upon invidious race discrimination. Rather, it was founded upon the fact that the group as a whole contained an unknown number of persons who could not readily be singled out and who were a threat to the security of the nation; and in order to impose effective restraints upon them it was necessary not only to deal with the entire group, but to deal with it at once.

*Id.* at 35. Later in its brief, the government stated that "[w]hat was needed was a method of removing at once the unknown number of Japanese persons who might assist a Japanese invasion, and not a program for sifting out such persons in the indefinite future." *Id.* at 62.

The government claimed that the "operative fact" on which the classification was made was the danger arising from the existence of over 100,000 persons of Japanese descent on the West Coast. *Id.* at 63. It acknowledged, however, that the "record in this case does not contain any comprehensive account of the facts which gave rise to the exclusion and curfew measures here involved." *Id.* at 10–11. The government therefore made extensive use of judicial notice in order to convey its position that those responsible for the orders reasonably regarded an emergency situation to exist. It argued that "historical facts" and "facts appear[ing] in official documents ... are peculiarly within the realm of judicial notice." *Id.* at 11.

The government's argument that the urgency of the situation made individual hearings to determine loyalty impossible was the subject of special concern. Solicitor General Charles Fahy filed a post-argument memorandum stressing that the hearings could not have been utilized because the "situation did not lend itself, in the *unique and pressing* circumstances, to solution by individual loyalty hearings." (emphasis added).[8]

---

8. The memorandum from Solicitor General Fahy to the Supreme Court on May 14, 1943, states more fully:

> Our position is not that hearings are an inappropriate method of reaching a decision on the question of loyalty. The Government does not contend that, assuming adequate opportunity for investigation, hearings may not ever be appropriately utilized on the question of the loyalty of persons here involved. It is submitted, however, that in the circumstances set forth in our brief, this method was not available to solve the problem which confronted the country. The situation did not

The Supreme Court decided the case on June 21, 1943. The government's view prevailed; Chief Justice Stone deferred to the military assessment of necessity. The Court saw the racial classification as justifiable only as a matter of military expediency, and indicated that it had to accept the judgment of the military authorities that the exigencies of time required the entire Japanese population to be treated as a group. The Court concluded:

> Whatever views we may entertain regarding the loyalty to this country of the citizens of Japanese ancestry, we cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population, whose number and strength could not be precisely and quickly ascertained. We cannot say that the warmaking branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with....

320 U.S. at 99, 63 S.Ct. at 1385.

The problem for the Court was stated with greater anguish in Justice Douglas' concurring opinion where he pointed out that "guilt is personal under our constitutional system. Detention for reasonable cause is one thing. Detention on account of ancestry is another." 320 U.S. at 107–08, 63 S.Ct. at 1389 (Douglas, J., concurring). He nevertheless rejected Hirabayashi's argument, concluding that expediency so required.

> Much of the argument assumes that as a matter of policy it might have been wiser for the military to have dealt with these people on an individual basis and through the process of investigation and hearings separated those who were loyal from those who are not. But the wisdom

or expediency of the decision which was made is not for us to review.... [W]here the peril is great and the time is short, temporary treatment on a group basis may be the only practicable expedient whatever the ultimate percentage of those who are detained for cause.

*Id.* at 106–07, 63 S.Ct. at 1388 (Douglas, J., concurring).

C. *The Coram Nobis Proceedings: General DeWitt's Report and Other Matters Developed in the Record Below.*

Hirabayashi filed this *coram nobis* proceeding early in 1983, alleging that new material had come to light in this decade which showed that the Department of War had suppressed evidence from both Hirabayashi and the Justice Department during the crucial period when the case was being presented to the Supreme Court, and that this material required the court to grant the unusual writ of *coram nobis* to vacate the convictions. The government, recognizing that the circumstances surrounding Hirabayashi's convictions may have been unjust,[9] nevertheless asked the district court to refrain from considering the facts, and to dismiss the petition for *coram nobis*. It asked the court instead to utilize the provisions of Fed.R.Crim.P. 48, permitting termination of a prosecution by dismissal of the indictment, to vacate the conviction. The district court denied the government's motion to dismiss and held a full evidentiary hearing on Hirabayashi's claims.

The principal factual matter developed at the trial concerned the suppressed report of General DeWitt. This report set forth the basis for his promulgation of the orders

---

lend itself, in the unique and pressing circumstances, to solution by individual loyalty hearings. In any event, the method of individual hearings was reasonably thought to be unavailable by those who were obliged to decide upon the measures to be taken.
*See Hirabayashi,* 627 F.Supp. at 1453–54 (quoting memo).

**9.** In its "response and motion," the government said it would be inappropriate to defend the convictions, noting that both the legislative and

executive branches have "long since concluded that the curfew and mass evacuation were part of an unfortunate episode in our nation's history." The government cited President Ford's 1976 proclamation formally rescinding Executive Order 9066, and the 1980 congressional creation of the Commission on Wartime Relocation and Internment of Civilians, along with the repeal in 1976 of Pub.L. No. 77–503 (then codified at 18 U.S.C. § 1383) which Hirabayashi was convicted of violating in 1942.

of which Hirabayashi stood convicted. At the time General DeWitt issued his series of orders regarding curfew and exclusion in 1942, neither he nor the War Department provided any factual explanation of the reasons for the orders. After they were issued, General DeWitt prepared such a report. The official version of the report, *Final Report: Japanese Evacuation from the West Coast 1942*, was dated June 5, 1943, but was not made public until January 1944. Recent historical research, however, has uncovered in the National Archives a previously unknown copy of an original version of that report. That copy reflects that General DeWitt transmitted his original report to the War Department in Washington on April 15, 1943. *See Hirabayashi*, 627 F.Supp. at 1449, 1455–56 (describing circumstances surrounding discovery and transmittal).

The original version differed materially from the official version. Most significantly, the original report did not purport to rest on any military exigency, but instead declared that because of traits peculiar to citizens of Japanese ancestry it would be impossible to separate the loyal from the disloyal, and that all would have to be evacuated for the duration of the war. Other documents in the record below show that officials in the War Department were alarmed when they received the original report. The district court observed that Assistant Secretary of War John J. McCloy was "more than a little exercised because the Final Report had been printed in final form and distributed without any prior consultation by the Western Defense Command with the War Department about its contents." 627 F.Supp. at 1450.

McCloy and Colonel Karl Bendetsen, who was in charge of the Wartime Civil Control Administration of the Western Defense Command, had a number of communications with General DeWitt in order to persuade him to change the report. *Id.* at 1450–53. At first intransigent, DeWitt stated "[I] [h]ave no desire to compromise in any way govt case in Supreme Court." 627 F.Supp. at 1451 (quoting Letter of May 5, 1943, from General DeWitt to Brigadier General Barnett). He eventually capitulat-

ed. The result was that the report was changed in several substantive respects after the War Department suggested some fifty-five alterations. The changes most relevant to this case were summarized by the district court as follows:

Page iii, paragraph 2, second sentence: Eliminate the words "and will continue for the duration of the present war." Page iii, paragraph 2, end of the second sentence: Insert "The surprise attack at Pearl Harbor by the enemy crippled a major portion of the Pacific Fleet and exposed the West Coast to an attack which could not have been substantially impeded by defensive fleet operations. More than 120,000 persons of Japanese ancestry resided in colonies adjacent to many highly sensitive installations. Their loyalties were unknown, and time was of the essence."

Page 9. Strike the following: "It was impossible to establish the identity of the loyal and the disloyal with any degree of safety. It was not that there was insufficient time in which to make such a determination; it was simply a matter of facing the realities that a positive determination could not be made, that an exact separation of the 'sheep from the goats' was unfeasible."

And replace with the following: "To complicate the situation, no ready means existed for determining the loyal and the disloyal with any degree of safety. It was necessary to face the realities—a positive determination could not have been made."

627 F.Supp. at 1451–52.

The revised, official version of the report was dated June 5, 1943. The War Department tried to destroy all copies of the original report when the revised version was prepared. This record contains a memo by Theodore Smith of the Civil Affairs Division of the Western Defense Command, dated June 29, 1943, certifying that he witnessed the burning of "the galley proofs, galley pages, drafts and memorandums of the original report of the Japanese Evacuation."

Edward Ennis, the Director of the Alien Enemy Control Unit of the Justice Department and a principal author of the government's 1942 brief, testified extensively in these proceedings. He testified as to his efforts in 1943 and 1944 in briefing both the *Korematsu* and *Hirabayashi* cases, and other efforts on the part of the Justice Department to obtain the full materials from the War Department supporting General DeWitt's decisions. While preparing the government's brief in *Hirabayashi*, Ennis learned that a report had been written but when he asked for a copy, the War Department gave him only a few selected pages. The district court observed, in denying the Government's Petition for Rehearing in this case, that it found Ennis entirely credible and that it believed that had Ennis had the original report showing the true rationale of DeWitt, he would have informed the Supreme Court of its contents.

On the basis of the evidence before it, the district court entered an extensive opinion setting forth the reasons for its decision to vacate the exclusion conviction. Judge Voorhees based that decision upon the factual record developed before him. He found first, that while the Supreme Court based its decision in *Hirabayashi* upon deference to military judgment of the need for expediency, General DeWitt, the person responsible for the racially based confinement of American citizens, had made no such judgment. The district court further found that the United States government doctored the documentary record to reflect that DeWitt had made a judgment of military exigency. Finally, the court found that had the suppressed material been submitted to the Supreme Court, its decision probably would have been materially affected. The government appeals the grant of relief.

The district court refused, however, to grant *coram nobis* relief with respect to the curfew conviction. It based that decision upon its conclusion that the Supreme Court would have drawn a legal distinction between the curfew and exclusion orders. It is from that denial of relief that Hiraba-

yashi appeals. We consider first the contentions of the government.

### III. THE GOVERNMENT'S CONTENTIONS IN ITS APPEAL

The government's contentions in its appeal from the district court's decision to vacate the exclusion conviction can be classified in four general categories. They are, first, that certain factual determinations of the district court are clearly erroneous; second, that the claims are barred by laches; third, that the case is moot because Hirabayashi does not continue to suffer from any adverse consequences from the convictions; and, finally, that the district court abused its discretion in reaching the merits of the petition by not granting the government's motion to vacate the convictions pursuant to Fed.R.Crim.P. 48.

#### A. *Factual Challenges.*

█ We turn to the government's challenge to certain of the district court's factual findings. The government first takes issue with the district court's finding that it was General DeWitt who made the decision that exclusion of all persons of Japanese ancestry from the West Coast was required by military necessity. 627 F.Supp. at 1456. Support for the finding that the decision was General DeWitt's is abundant in this record. Secretary of War Stimson delegated his authority to General DeWitt pursuant to the power delegated to Stimson by the President. *See* Public Proclamation No. 1, 7 Fed.Reg. 2320 (1942). There has been no showing that General DeWitt even consulted with War Department officials in Washington before issuing the orders Hirabayashi refused to obey. It is now clear that DeWitt did not consult with Washington before preparing his final report. *Hirabayashi*, 627 F.Supp. at 1450. As one commentator wrote soon after the orders were issued: "The Japanese question had political and economic angles, but the President's Executive Order of February 19 treated it as fundamentally a military problem and placed responsibility squarely upon the Commanding General." Fairman, *The*

*Law of Martial Rule and the National Emergency,* 55 Harv.L.Rev. 1253, 1299 (1942).

The government points to uncontroverted evidence in the record that there were those in the War Department who did not agree with the reasons given by General DeWitt for the order and would have justified the order on other grounds. This evidence, however, merely underscores the critical nature of General DeWitt's decision and his report. It was because General DeWitt had exercised the authority, and because his judgment was essential, that the War Department suppressed the original version of his report in the first place. Indeed, Solicitor General Fahy in his oral argument in 1944 in *Korematsu* conceded that it was the views of the Commanding General which counted, and that if his orders had been based upon racist precepts, they would have been invalid. The following colloquy took place in which Justice Frankfurter and the Solicitor General discussed the revised version of DeWitt's report without knowledge of the existence of the original version.

MR. JUSTICE FRANKFURTER: Suppose the commanding general, when he issued Order No. 34, had said, in effect, "It is my judgment that, as a matter of security, there is no danger from the Japanese operations; but under cover of war, I had authority to take advantage of my hostility and clear the Japanese from this area." Suppose he had said that, with that kind of crude candor. It would not have been within his authority, would it?

MR. FAHY: It would not have been.

MR. JUSTICE FRANKFURTER: As I understand the suggestion, it is that, as a matter of law, the report of General DeWitt two years later proved that that was exactly what the situation was. As I understand, that is the legal significance of the argument.

MR. FAHY: That is correct, Your Honor; and the report simply does nothing of the kind.

To support its position the government cites language in the Supreme Court's opinion in *Hirabayashi,* referring to the judgment of Congress and military authorities, in order to suggest that somehow the Supreme Court made a factual finding contrary to the district court's finding. *Hirabayashi,* 320 U.S. at 99, 63 S.Ct. at 1385. Neither the Supreme Court's opinion nor the record before it in 1943 supports such an argument. The district court's decision correctly reflects the historical record that the orders were the direct result of General DeWitt's exercise of the authority delegated to him. The district court's finding that it was General DeWitt who decided that the curfew and exclusion orders were required is not clearly erroneous.

The government next challenges as factually erroneous the district court's finding that the Supreme Court in 1943 would probably have reached a different result in the exclusion case if it had known the true basis for the General's decision. The government disagrees with the following portions of the district court's opinion:

> Had the statement of General DeWitt been disclosed to petitioner's counsel, they would have been in a position to argue that, contrary to General DeWitt's belief, there were in fact means of separating those who were loyal from those who were not; that the legal system had developed through the years means whereby factual questions of the most complex nature could be answered with a high degree of reliability. Counsel for petitioner could have pointed out that with very little effort the determination could have been made that tens of thousands of native-born Japanese Americans—infants in arms, children of high school age or younger, housewives, the infirm and elderly—were loyal and posed no possible threat to this country.

> \*　　\*　　\*　　\*　　\*　　\*

> Had counsel for petitioner known and been able to present to the Supreme Court the [initial] reason stated by General DeWitt for the evacuation of all Japanese, [and] ... [i]f the military necessity for exclusion was the impossibility of separating the loyal from the disloyal, the Supreme Court would not have

had to defer to military judgment because this particular problem, separating the loyal from the disloyal, was one calling for judicial, rather than military, judgment.

627 F.Supp. at 1456–57.

The government characterizes its challenge as one to a factual finding, which we must uphold unless clearly erroneous. To the extent, however, that the government is asking us to assess the district court's judgment as to the legal materiality of the suppressed evidence, it is also raising a question of law, and we review with greater latitude. *See McConney*, 728 F.2d at 1204 (adopting functional analysis for mixed questions of law and fact).

In making this challenge, the government agrees with petitioner and the district court that the Supreme Court in *Hirabayashi* deferred to a military judgment that circumstances required the prompt evacuation of all Japanese Americans, and that there was not enough time to attempt to separate the loyal from the disloyal. The government also agrees with petitioner and the district court that General DeWitt acted on the basis of his own racist views and not on the basis of any military judgment that time was of the essence. What the government contends in this appeal is that on the basis of the record before it, the Supreme Court should have known both that General DeWitt was a racist, and that he made no military judgment of emergency. The government asks us to hold, therefore, that the Supreme Court probably would have reached the same erroneous result even if the government had not suppressed the evidence and had accurately represented to the Court the basis of General DeWitt's decision.

There are several problems with this position. First, as the district court observed when it denied rehearing, the material in the record before the Supreme Court showing General DeWitt's racism was limited primarily to a newspaper clipping. More importantly, it was principally Hirabayashi and those amici who supported him, not the government, who presented the evidence of racial bias to the Court and who argued that the decisions must have been based upon racism rather than military necessity. By contrast, the information now in the public record constitutes objective and irrefutable proof of the racial bias that was the cornerstone of the internment orders.

The basis for General DeWitt's decision was a very crucial issue which divided the government and Hirabayashi. For illustration, Hirabayashi's brief referred to testimony by DeWitt indicating that "prejudice dominated his thinking," and quoted him as stating: "It makes no difference whether the Japanese is theoretically a citizen ... A Jap is a Jap." *San Francisco News*, April 13, 1943, at 1, *cited in* Reply Brief for Appellant at 1 n. 2. Extracts from the newspaper article were reproduced in the appendix to that brief. The Amicus Brief of the American Civil Liberties Union, in support of Hirabayashi's position, also suggested that the order was based upon the racist view that it was impossible to segregate the loyal from the disloyal:

> There were those, of course, who claimed that it would have been impossible to tell the loyal from the disloyal; who said that all persons of Japanese ancestry look alike. It is a challenge to the intelligence of this nation that such childish opinions actually carried the day.

Brief for American Civil Liberties Union at 13. Similar arguments were made by the Japanese American Citizens League in their Amicus Brief in support of Hirabayashi.

The government, on the other hand, through the device of judicial notice asked the Supreme Court to recognize that the judgment made was one of exigency; the "principal danger to be apprehended was a Japanese invasion." Brief for United States at 65. It argued that the "situation did not lend itself, in the unique and pressing circumstances, to solution by individual loyalty hearings." Post-Argument Memorandum of Solicitor General Fahy. In deciding the case against Hirabayashi, the Supreme Court obviously accepted the government's view of the facts as the government presented them in 1943, and rejected Hirabayashi's.

In asking us to hold that the Supreme Court would have reached the same result even if the Solicitor General had advised Hirabayashi and the Court of the true basis for General DeWitt's orders, the government ignores the fact that in 1943 it was clearly in a better position to know that basis than was the defense. It also ignores the traditionally special relationship between the Supreme Court and the Solicitor General which permits the Solicitor General to make broad use of judicial notice and commands special credence from the Court.[10] The record here shows that Ennis, in preparing the government's brief, felt that responsibility keenly.[11]

10. Traditionally, the Supreme Court has shown great respect for the views of the Solicitor General—"an advocate whom the Court can trust." See Jenkins, The Solicitor General's Winning Ways, 69 A.B.A.J. 734 (1983); Note, Government Litigation in the Supreme Court: The Roles of the Solicitor General, 78 Yale L.J. 1442 (1969). Thus, he owes a special obligation to the Court as well as his client. See O'Connor, The Amicus Curiae Role of the U.S. Solicitor General in Supreme Court Litigation, 66 Judicature 256 (1983); Note, The Solicitor General and Intragovernmental Conflict, 76 Mich.L.Rev. 324 (1977). See also Speech by Rex Lee, Solicitor General of the United States 1981–85, Ohio State University College of Law (March 19, 1986) Lawyering for the Government: Politics, Polemics & Principle, reprinted in 47 Ohio St. L.J. 595 (1986) (discussing multiple roles of Solicitor General).

11. As the Justice Department prepared its brief, Ennis came into possession of the intelligence work of Lt. Commander Kenneth D. Ringle, an expert on Japanese intelligence in the Office of Naval Intelligence. Ringle had reached conclusions directly contradicting the two key premises in the government's argument. Ringle found (1) that the cultural characteristics of the Japanese Americans had not resulted in a high risk of disloyalty by members of that group, and (2) that individualized determinations could be made expeditiously. See K. Ringle, Report on the Japanese Question 3 (Jan. 26, 1942). Ennis therefore concluded:

I think we should consider very carefully whether we do not have a duty to advise the Court of the existence of the Ringle memorandum and of the fact that this represents the view of the Office of Naval Intelligence. It occurs to me that any other course of conduct might approximate the suppression of evidence.

Memorandum from Ennis to Solicitor General Re: Japanese Brief, April 30, 1943. Notwithstanding Ennis' plea, the Justice Department's

The importance which the Supreme Court attached to the statements of the government regarding the factual situation at the time was brought out during the course of the proceedings in Korematsu, decided a year after Hirabayashi. By the time Korematsu was briefed and argued, the revised version of DeWitt's report had been made public. Justice Department attorneys with access to contemporaneous intelligence reports had had misgivings about the accuracy of even that version. This apprehension was reflected in a footnote to the government's brief in Korematsu limiting reliance on the report.[12] The footnote came up during oral argument,

brief in Hirabayashi made no mention of Ringle's analysis.

12. The footnote actually inserted in the government's brief was as follows:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944), hereinafter cited as Final Report, is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. We have specifically recited in this brief the facts relating to the justification for the evacuation, of which we ask the Court to take judicial notice, and we rely upon the Final Report only to the extent that it relates to such facts.

Korematsu, Brief for the United States at 11 n. 2. Based upon the revised report, and without knowledge of the existence of the original version, lawyers within the Justice Department had pushed for a stronger footnote which would have at least partially discredited the report. The proposal for this footnote was contained in a memorandum from John L. Burling to Assistant Attorney General Herbert Wechsler dated September 11, 1944, reprinted in Appendix B, Korematsu, 584 F.Supp. at 1423. The full text of the footnote he proposed was:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. The recital of the circumstances justifying the evacuation as a matter of military necessity, however, is in several respects, particularly with reference to the use of illegal radio transmitters and to shore-to-ship signalling by persons of Japanese ancestry, in conflict with information in possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not ask the Court to take judicial notice of the recitals of those facts contained in the Report. (emphasis added).

the transcript of which is in this record. Solicitor General Fahy denied that the footnote was a repudiation of the military necessity of the evacuation and reaffirmed the government's position in *Hirabayashi*.[13]

The Court's divided opinions in *Korematsu* demonstrate beyond question the importance which the Justices in *Korematsu* and *Hirabayashi* placed upon the position of the government that there was a perceived military necessity, despite contrary arguments of the defendants in those cases. The majority in *Korematsu* reaffirmed the Court's deference in *Hirabayashi* to military judgments. Justice Murphy's dissent highlighted the difference between his position and the majority's. He expressly faulted the majority's acceptance of the government's justification that "time is of the essence." We now know this very phrase was inserted by the War Department into DeWitt's final report and was not a concept upon which DeWitt himself based his decision. Justice Murphy said:

> No adequate reason is given for the failure to treat these Japanese Americans on an individual basis by holding investigations and hearings to separate the loyal from the disloyal, as was done in the case of persons of German and Italian ancestry. [citation omitted] *It is asserted merely that the loyalties of this group "were unknown and time was of the essence."*

*Korematsu*, 323 U.S. at 241, 65 S.Ct. at 205 (Murphy, J., dissenting) (emphasis added). Justice Jackson's dissent zeroed in on the majority's acceptance of General DeWitt's revised report. He stated:

> So the Court, having no real evidence before it, has no choice but to accept

General DeWitt's own unsworn, self-serving statement, untested by any cross-examination, that what he did was reasonable. And thus it will always be when courts try to look into the reasonableness of a military order.

*Id.* at 245, 65 S.Ct. at 207 (Jackson, J., dissenting).

The majority decision in *Korematsu* was a reaffirmation that it would defer to a military judgment of necessity in upholding first the curfew and then the exclusion orders.

> Like curfew, exclusion of those of Japanese origin was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country. It was because we could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal that we sustained the validity of the curfew order as applying to the whole group. In the instant case, temporary exclusion of the entire group was rested by the military on the same ground.

*Id.* at 218–19, 65 S.Ct. at 195. The claimed emergency preventing the separation of loyal from disloyal Japanese Americans was critical to the Supreme Court's decisions upholding the internment of Hirabayashi and Korematsu. This was clearly evidenced when the Court subsequently held that detention of a concededly loyal Japanese American citizen was unlawful. *See Ex Parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

We cannot hold that the district court erred in deciding that the reasoning of the Supreme Court would probably have been

**13.** After being asked to make copies of the DeWitt report available to the Court, Solicitor General Fahy agreed and said:

> It is even suggested that because of some foot note in our brief in this case indicating that we do not ask the Court to take judicial notice of the truth of every recitation or instance in the final report of General DeWitt, that the Government has repudiated the military necessity of the evacuation. It seems to me, if the Court please, that that is a neat little piece of fancy dancing. There is nothing in

the brief of the Government which is any different in this respect from the position it has always maintained since the Hirabayashi case—that not only the military judgment of the general, but the judgment of the Government of the United States, has always been in justification of the measures taken; and no person in any responsible position has ever taken a contrary position, and the Government does not do so now. Nothing in its brief can validly be used to the contrary.

profoundly and materially affected if the Justice Department had advised it of the suppression of evidence which established the truthfulness of the allegations made by Hirabayashi and Korematsu concerning the real reason for the exclusion order.

### B. *Coram Nobis Requirements: the Issues of Laches and Mootness.*

■ Hirabayashi has filed a petition for a writ of error *coram nobis* asking the court to vacate his 1942 misdemeanor convictions. In *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), the Supreme Court held that *coram nobis* relief is available to challenge the validity of a conviction, even though the sentence has been fully served, *id.* at 503–04, 74 S.Ct. at 248–49, "under circumstances compelling such action to achieve justice." *Id.* at 511, 74 S.Ct. at 252. As we recently explained in *Yasui v. United States*, 772 F.2d 1496, 1498 (9th Cir.1985), the *coram nobis* writ "fills a void in the availability of post-conviction remedies in federal criminal cases." A convicted defendant who is in federal custody and claims that his sentence "was imposed in violation of the Constitution or laws of the United States ... or is otherwise subject to collateral attack" may move to have his sentence vacated under 28 U.S.C. § 2255. Such habeas corpus relief is not available, however, to a defendant who has served his sentence and has been released from custody. In such a situation, "no statutory avenue to relief [exists] from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact." *Yasui*, 772 F.2d at 1498. *See Morgan*, 346 U.S. at 512–13, 74 S.Ct. at 253 (noting potential collateral consequences; "[s]ubsequent convictions may carry heavier penalties, civil rights may be affected"). Nor is a motion for a new trial based on newly discovered evidence available to petitioners who have long since served their sentences because such a motion must be filed within two years of the date of the final judgment in the original proceeding. *See* Fed.R. Crim.P. 33; *United States v. Dellinger*, 657 F.2d 140, 144 (7th Cir.1981).

■ Thus, the *coram nobis* writ allows a court to vacate its judgments "for errors of fact ... in those cases where the errors [are] of the most fundamental character, that is, such as rendered the proceeding itself invalid." *United States v. Mayer*, 235 U.S. 55, 69, 35 S.Ct. 16, 19–20, 59 L.Ed. 129 (1914). Although Federal Rule of Civil Procedure 60(b) expressly abolishes the writ of *coram nobis* in civil cases, the extraordinary writ still provides a remedy in criminal proceedings where no other relief is available and sound reasons exist for failure to seek appropriate earlier relief. *Morgan*, 346 U.S. at 505 n. 4, 74 S.Ct. at 249 n. 4. *See also James v. United States*, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) (opinion of Justice Brennan supporting denial of petition for writ of certiorari explaining purpose of *coram nobis*). The Court in *Morgan* held that district courts have the power to issue the writ under the All Writs Act, 28 U.S.C. § 1651(a). *See* 346 U.S. at 506–09, 74 S.Ct. at 250.

Based on the authority discussed above, the district court determined that a petitioner must show the following to qualify for *coram nobis* relief: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.[14] The government challenges the court's conclusions under (2) and (3).

---

**14.** 627 F.Supp. at 1454–55. Relying on a footnote in *Dellinger*, 657 F.2d at 144 n. 9, the court required a showing that "it is probable that a different result would have occurred had the error not been made." We note here that neither the Supreme Court nor this circuit has imposed such a requirement. In *Dellinger*, the Seventh Circuit cited *Bateman v. United States*, 277 F.2d 65, 68 (8th Cir.1960), which in turn relied on the dissent in *Morgan*, 346 U.S. at 516,

74 S.Ct. at 255. The majority in *Morgan* never required a showing of prejudice. We need not decide whether there is as high a test as the *Dellinger* footnote suggests because petitioner has satisfied the higher standard.

The district court also stated, citing *Morgan*, 346 U.S. at 507 n. 9, 74 S.Ct. at 250 n. 9, that the petition must be brought in the convicting court. Hirabayashi satisfied this condition by

The government argues that the district court should have dismissed the petitioner's claim on the ground of laches. It argues that the material upon which the petitioner relies had been a matter of public record for decades, or, alternatively, that petitioner by due diligence should have found the material earlier. For the reasons we have discussed in the preceding section of this opinion, the district court's decision to grant the writ was clearly based upon material which was not known until very recently. The key document upon which the district court relied was the suppressed report of General DeWitt. The district court squarely confronted the government's laches contention by stating as follows:

> [T]he government argues that all of the factual material presented on behalf of petitioner has been a matter of public record for nearly forty years and that petitioner is hence bound by the doctrine of laches from seeking to overturn his convictions.... At no place in [the 1949 Grodzins book] is there any reference to the statements made by General DeWitt in the initial version of his Final Report. In none of the other publications submitted by the government is there any such reference.

627 F.Supp. at 1455. These findings are clearly supported.

The suppressed DeWitt Report is not the only evidence which has surfaced as a result of research during this decade. There are memos, which have only recently come to light, by Justice Department lawyers Ennis and Burling relating to the War Department's suppression of the revised report, and their doubts about the accuracy of the report. *See supra* notes 11–12. The discovery of these materials recently caused the District of Columbia Circuit to hold that the government's fraudulent concealment tolled the statute of limitations in cases brought by Japanese Americans for civil damages arising out of their internment. *Hohri v. United States*, 782 F.2d 227, 246 (D.C.Cir.1986), *vacated on juris-*dictional grounds, —— U.S. ——, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). It appears from both the district court opinion, 586 F.Supp. 769 (D.D.C.1984), and the court of appeals opinion in *Hohri*, decided before publication of the district court's opinion in this case, that the original DeWitt Report was not a part of the *Hohri* record. Thus, ours is an even stronger case against the government. In addition, because this is a collateral attack upon a criminal conviction, there is no statute of limitations. The petitioner does not have to prove fraud.

As to the diligence of Hirabayashi in finding the material, we must agree with the district judge who heard direct evidence on this issue and found that "petitioner cannot be faulted for not finding and relying upon [the only surviving copy of the initial version of the report] long before he brought this action in early 1983." 627 F.Supp. at 1455. Professional historians had failed to discover it as well, and the difficulty for a lay person to locate the initial version was documented in the record by testimony concerning its discovery. *Id.* at 1453–56.

Regarding the mootness issue, the district court, although noting that misdemeanor convictions do not present the same adverse consequences as do felony convictions, was satisfied that the case or controversy requirement was fulfilled. The court found that (1) Hirabayashi's credibility might be impeached in a jurisdiction that allows the use of misdemeanor convictions for that purpose, and (2) that a judge could take the convictions into account when sentencing Hirabayashi if he were ever convicted of another crime. 627 F.Supp. at 1455.

The government contends that "ordinary misdemeanors have no 'collateral consequences' and therefore are not subject to post-conviction attack absent some special legal disability." For the following reasons, we find no support for such a per se rule and conclude that the case is not moot.

bringing his petition in the Western District of Washington, the district in which he was convicted.

Modern application of mootness principles to criminal cases must draw upon the Supreme Court's opinion in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), where the Court determined that it had jurisdiction to hear Sibron's appeal even though he had completely served his six-month sentence for unlawful possession of heroin. The Court held that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Id.* at 57, 88 S.Ct. at 1900. In *Sibron* the Court discussed its previous holding in *Pollard v. United States*, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), where

> the Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed.... Stat[ing] that "convictions may entail collateral legal disadvantages in the future," *id.*, at 358, [77 S.Ct. at 484], the Court concluded that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits." *Ibid.* The Court thus acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences. [footnote omitted] The mere "possibility" that this will be the case is enough to preserve a criminal case from ending "ignominiously in the limbo of mootness." *Parker v. Ellis*, 362 U.S. 574, 577, [80 S.Ct. 909, 911, 4 L.Ed.2d 963] (1960) (dissenting opinion).

*Sibron*, 392 U.S. at 55, 88 S.Ct. at 1898–99.

The Court acknowledged that it was applying the *Pollard* presumption and then went on to state:

This case certainly meets that test for survival. Without pausing to canvass the possibilities in detail, we note that New York expressly provides by statute that Sibron's conviction may be used to impeach his character ... [and must be considered in subsequent sentencing]. There are doubtless other collateral consequences.

*Sibron*, 392 U.S. at 55–56, 88 S.Ct. at 1899. The government argues that this language and an accompanying footnote require a petitioner to show specific legislative disability. *Id.* at 56 n. 17, 88 S.Ct. at 1899 n. 17.[15] The *Sibron* opinion creates no such requirement. This is reflected in our own *coram nobis* decisions which consistently apply the *Sibron* "*no* possibility of *any* collateral legal consequences" test. *See, e.g., Chavez v. United States*, 447 F.2d 1373, 1374 (9th Cir.1971) (per curiam); *Byrnes v. United States*, 408 F.2d 599, 601 (9th Cir.), *cert. denied*, 395 U.S. 986, 89 S.Ct. 2142, 23 L.Ed.2d 775 (1969). We have repeatedly reaffirmed the presumption that collateral consequences flow from any criminal conviction. *See, e.g., Byrnes*, 408 F.2d at 601. As we stated in *Holloway*, *coram nobis* relief is available to prevent manifest injustice "even where removal of a prior conviction will have little present effect on the petitioner." *Holloway v. United States*, 393 F.2d 731, 732 (9th Cir. 1968).

No court to our knowledge has ever held that misdemeanor convictions cannot carry collateral legal consequences. Any judgment of misconduct has consequences for which one may be legally or professionally

**15.** The *Sibron* footnote provides:

> We note that there is a clear distinction between a general impairment of credibility, to which the Court referred in *St. Pierre, see* 319 U.S., at 43, [63 S.Ct. at 911], and New York's specific statutory authorization for use of the conviction to impeach the "character" of a defendant in a criminal proceeding. The latter is a clear legal disability deliberately and specifically imposed by the legislature. The government also cites *Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982), for the proposition that there must be statutory consequences from a conviction to

permit *coram nobis* relief. The case is distinguishable on several grounds. *Lane* did not involve a *coram nobis* petition. It did not even involve a challenge to a criminal conviction. It was an effort through habeas corpus to attack mandatory parole requirements which the court held could not be pursued beyond the expiration of the parole term. Contrary to the government's view, the Court in *Lane* reaffirmed the *Sibron* standard, quoting the no possibility of any collateral legal consequences test and explicitly stating that *Sibron* was not applicable to that case. *Id.* at 632, 102 S.Ct. at 1327.

accountable. *See Miller v. Washington State Bar Ass'n,* 679 F.2d 1313, 1318 (9th Cir.1982) (letter of admonition in attorney's permanent record for which he is professionally accountable constitutes sufficient adverse consequence for Article III).

Moreover, the government's argument here that "ordinary" misdemeanors should not carry the presumption of adverse consequences is misplaced. Hirabayashi's conviction was for no ordinary misdemeanor. His conviction was one which has been the subject of controversy for more than four decades. A United States citizen who is convicted of a crime on account of race is lastingly aggrieved.

C. *The Government's Motion to Vacate and Dismiss.*

▪ The government contends that the trial court erred by denying its motion to vacate Hirabayashi's convictions and dismiss the underlying indictments pursuant to Fed.R.Crim.P. 48(a).

Rule 48(a) provides:

The Attorney General or the United States attorney may by leave of the court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.

The rule vests the courts with the discretion to accept or deny the prosecution's motion. *See, e.g., United States v. Weber,* 721 F.2d 266, 268 (9th Cir.1983) (per curiam); *United States v. Cowan,* 524 F.2d 504, 510–11 (5th Cir.1975), *cert. denied sub nom. Woodruff v. United States,* 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976). We therefore review the district court's decision for an abuse of discretion. *Rinaldi v. United States,* 434 U.S. 22, 32, 98 S.Ct. 81, 86 (1977) (per curiam).

In denying the government's motion, the district court correctly stated that Rule 48(a) provides for dismissal only by leave of the court. The court then determined that "where petitioner seeks to have his petition considered on its merits, the Court is of the opinion that it is not in the public interest, over the objection of petitioner, to grant the government's motion." The government argues that the trial court erroneously relied on the second sentence of Rule 48(a) in requiring Hirabayashi's consent to dismissal because the rule only addresses the accused's consent during trial. It asserts that no consent is necessary once the trial is over.

The district court, however, did not base its denial on a belief that Hirabayashi's consent was necessary. Rather, it exercised its discretion under the first sentence of Rule 48(a) which requires the prosecutor to have the leave of court to file a dismissal. The district court correctly acted within its discretion in refusing to grant the government's motion. There is no precedent for applying Rule 48 to vacate a conviction after the trial and appellate proceedings have ended. The cases cited by the government involve a prosecutor's motion made before or during the pendency of a direct appeal. *See Rinaldi,* 434 U.S. at 24–25, 98 S.Ct. at 82–83 (motion made when case was on direct appeal); *Weber,* 721 F.2d at 267 (motion made when case was on direct appeal); *United States v. Hamm,* 659 F.2d 624, 625 (5th Cir.1981) (en banc) (motion made before sentencing); *Cowan,* 524 F.2d at 513 (motion made before trial).

In a case similar to this one, *Korematsu v. United States,* 584 F.Supp. 1406 (N.D. Cal.1984), a district court judge recently held that the government could not move under Rule 48(a) to vacate a conviction following the lapse of 40–odd years. There, Judge Patel pointed out that Rule 48(a) had its roots in the common law doctrine of *nolle prosequi.* "As the literal translation of *nolle prosequi*—'I am unwilling to prosecute'—makes clear, the primary purpose of the doctrine was to allow the government to cease active prosecution." *Id.* at 1410–11 (discussing in detail the development of Rule 48). The court concluded that

the prosecutor has no authority to exercise his *nolle prosequi* prerogatives at common law or to invoke Rule 48(a) after a person has been subject to conviction, final judgment, imposition of sentence

and exhaustion of all appeals and, indeed, after a lapse of many years. At that stage, there is no longer any prosecution to be terminated.

*Id.* at 1411.

We need not decide whether Rule 48 precludes a district court from ever granting a post-appeal dismissal. Based on the record in this case we cannot find that the district court abused its discretion in denying the government's motion and considering the merits of Hirabayashi's request that an injustice be corrected.

## IV. HIRABAYASHI'S APPEAL OF THE DISTRICT COURT'S REFUSAL TO VACATE THE CURFEW CONVICTION

The district court vacated Hirabayashi's conviction for violation of the exclusion order but left standing the conviction for violation of the curfew order. This was a result which neither side sought and which neither strenuously defends in this court.

The district court based its distinction on the premise that the curfew was a lesser restriction on freedom than the exclusion. It does not follow, however, that the Supreme Court would have made such a distinction had it been aware of the suppressed evidence. The Supreme Court in 1943 reviewed only the curfew order and clearly saw it as a serious deprivation of liberty. The Court therefore held that it would be justified only on the basis of a reasonable military judgment of military necessity. 320 U.S. at 99, 63 S.Ct. at 1385.

The government suggests that the Justices in the *Hirabayashi* decision might have made a distinction between the two orders because the dissenting Justices later in *Korematsu* distinguished the level of infringement of freedom in *Korematsu* from that in *Hirabayashi*. *Korematsu*, 323 U.S. at 246–47, 65 S.Ct. at 207–08 (Jackson, J., dissenting). The relevant issue, however, is not whether a minority of the Justices might have made a distinction, but whether a majority would have. The majority of the Court in *Korematsu* followed exactly the same rationale that was followed in *Hirabayashi* and made no such distinction. The majority of the Court in *Korematsu* said "[n]othing short of apprehension by the proper military authorities of the gravest imminent danger to the public safety can constitutionally justify either [the exclusion or the curfew]." 323 U.S. at 218, 65 S.Ct. at 195.

We have seen that Hirabayashi's two convictions were based upon simultaneous indictments, were tried together, briefed together, and decided together. In its brief to the Supreme Court, the Justice Department argued a single theory of military necessity to support both the exclusion and curfew orders. At the evidentiary hearing before the district court in this case, Ennis explained why:

Q.... Did the Department's arguments on those two points [curfew and exclusion] differ somewhat?

A. No, not substantially.

Q. Well,—

A. Because although one was a lesser restriction, it was equally based on what was in our view the difficulty of classifying American citizens—including American citizens. That's for general curfew of the whole area.

The district court erred in distinguishing between the validity of the curfew and exclusion convictions.

## CONCLUSION

The judgment of the district court as to the exclusion conviction is affirmed. The judgment as to the curfew conviction is reversed and the matter is remanded with instructions to grant Hirabayashi's petition to vacate both convictions.