**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MAUREEN ELAINE CHAN, AKA
Maureen Ridley,
*Defendant-Appellant*.

No. 14-55239

D.C. No.
2:93-CR-00583-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
February 2, 2015—Pasadena California

Filed July 9, 2015

Before: Dorothy W. Nelson, Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge D.W. Nelson;
Concurrence by Judge Bybee;
Dissent by Judge Ikuta

# SUMMARY[*]

## Coram Nobis

The panel reversed the district court's dismissal of a petition for a writ of error coram nobis in a case in which Maureen Elaine Chan sought to withdraw her guilty plea on the ground that defense counsel affirmatively misrepresented the adverse immigration consequences of her conviction.

The panel held that *United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005) (holding that affirmatively misleading a client regarding the immigration consequences of a conviction could constitute the basis for an ineffective assistance of counsel claim), survives *Padilla v. Kentucky*, 559 U.S. 356 (2010) (holding that in order to satisfy the Sixth Amendment, defense counsel must inform her client whether his plea carries a risk of deportation), and did not establish a new rule of criminal procedure under *Teague v. Lane*, 489 U.S. 288 (1989). The panel thus held that *Kwan* applies retroactively to Chan's case, and remanded for the district court to evaluate the merits of the petition in the first instance.

Judge Bybee concurred. He agreed with the majority opinion that *Kwan* did not create a new rule under *Teague*. But in his view, the panel should reverse for an independent, more compelling reason: Chan's coram nobis petition is on all fours with *Kwan*, in which this court granted coram nobis relief.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Ikuta wrote that *Kwan* created a new rule, and cannot be applied retroactively to Chan's case, because the result in *Kwan* was not dictated by precedent existing at the time Chan's conviction became final and would not have been apparent to all reasonable jurists.

## COUNSEL

Mark M. Kassabian, Buehler & Kassabian, LLP, Pasadena, California, for Defendant-Appellant.

André Birotte, Jr., United States Attorney, Robert Dugdale, Chief, Criminal Division, Jean-Claude Andre (argued) and Wilson Park, Assistant United States Attorneys, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Appellant Maureen Elaine Chan, a/k/a Maureen Ridley ("Chan"), appeals the district court's dismissal of her petition for a writ of error coram nobis. This case requires us to determine the retroactivity of our prior decision in *United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005). Because we conclude that *Kwan* both survives *Padilla v. Kentucky*, 559 U.S. 356 (2010), and did not establish a new rule of criminal procedure under *Teague v. Lane*, 489 U.S. 288 (1989), we thus hold that *Kwan* applies retroactively to Chan's case. Accordingly, we reverse the district court's order dismissing Chan's petition and remand for further proceedings consistent with this opinion.

## I. Background

On June 22, 1993, Chan was charged with six counts of perjury under 18 U.S.C. § 1623. Chan pleaded guilty pursuant to a plea agreement to three counts of perjury and was sentenced to two months imprisonment, three years of supervised release, and a special assessment of $150. Chan is a British citizen but has been a lawful permanent resident of the United States since 1973.

Prior to pleading guilty, Chan alleges that she consulted with her attorney and specifically asked him whether a guilty plea would affect her immigration status. She further alleges that her attorney assured her that she would not face any adverse immigration consequences.

Chan states that on February 28, 2012, she was stopped by U.S. Customs and Border Protection agents at Los Angeles International Airport, who then confiscated her passport and permanent resident card. On November 15, 2012, the Department of Homeland Security initiated removal proceedings against Chan and served her with a Notice to Appear, charging her as inadmissible under § 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act as an immigrant convicted of a crime involving moral turpitude. 8 U.S.C. § 1182(a)(2)(A)(i)(I).

On May 15, 2013, Chan brought a petition for writ of error coram nobis in the district court. Chan sought to withdraw her guilty plea and supported her petition with one claim of ineffective assistance of counsel ("IAC"), alleging that defense counsel affirmatively misrepresented the adverse immigration consequences of her conviction. Chan claimed that, had she known the true nature of the immigration

consequences of her potential convictions, she would have requested a different plea deal or gone to trial.

On September 24, 2013, the government filed a motion to dismiss the petition. The district court granted the government's motion to dismiss, concluding that *Kwan* established a new rule of criminal procedure under *Teague* and, therefore, did not have retroactive effect. Chan timely appealed the district court's dismissal to this court.

## II. Standard of Review

"A district court's denial of a petition for a writ of error coram nobis is reviewed de novo." *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007).

## III. Discussion

"[T]he writ of error coram nobis is a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *Id.*; *see also United States v. Morgan*, 346 U.S. 502, 511 (1954) (describing the writ of error coram nobis as an "extraordinary remedy" available "only under circumstances compelling such action to achieve justice"). In order to establish that she qualifies for coram nobis relief, the petitioner must show the following four factors:

> (1) a more usual remedy is not available;

> (2) valid reasons exist for not attacking the conviction earlier;

(3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and

(4) the error is of the most fundamental character.

*Riedl*, 496 F.3d at 1006 (quoting *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987)).

The district court dismissed Chan's petition under—and the parties only dispute—the fourth factor. Specifically, the district court concluded that because *Kwan* established a new rule under *Teague* and, thus, does not apply retroactively, Chan had failed to state a claim for IAC and could not show that there was an error of "the most fundamental character."

To determine whether Chan may proceed with her IAC claim under *Kwan*, we first look to whether *Kwan* survives *Padilla*.[1] We then turn to whether this case is controlled by *Chaidez v. United States*, 133 S. Ct. 1103 (2013), which concluded that *Padilla* does not apply retroactively, and whether *Kwan* established a new rule of criminal procedure under *Teague*.

## A. Whether *Padilla* abrogates *Kwan*

In *Kwan*, we held that affirmatively misleading a client regarding the immigration consequences of a conviction

---

[1] The government made this argument before the district court, but has not pursued it on appeal. Although the government has thus waived this argument, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999), we find it a necessary starting point for our analysis.

could constitute the basis for an IAC claim. 407 F.3d at 1015. We noted that our holding was notwithstanding our earlier-espoused rule that "an attorney's failure to advise a client of the immigration consequences of a conviction, without more, does not constitute ineffective assistance of counsel." *Id.* (citing *United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003), *abrogated by Padilla*, 559 U.S. 356).

Five years after *Kwan*, the Supreme Court changed the landscape of IAC claims and held that, in order to satisfy the Sixth Amendment, defense counsel "must inform her client whether his plea carries a risk of deportation." *Padilla*, 559 U.S. at 374. This holding abrogated the existing rule in all ten courts of appeals that had reached this issue—including ours, *Fry*, 322 F.3d 1198—as the courts of appeals had uniformly concluded that the mere failure to advise regarding the possibility of deportation could not establish an IAC claim. *Chaidez*, 133 S. Ct. at 1109 & n.7.

*Padilla* was simultaneously broader and narrower than our decision in *Kwan*: broader in that *Padilla* reached affirmative misrepresentations and failure to advise, but narrower in that *Padilla* concerned only deportation whereas *Kwan* considered all "immigration consequences." *Compare Padilla*, 559 U.S. at 364–66, 369–74, *with Kwan*, 407 F.3d at 1015–17. Further, the crux of *Padilla*'s holding was to reject the direct/collateral consequence distinction in the context of deportation to "conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." 559 U.S. at 366. *Kwan*, though, concerned itself more with the fact that an attorney misadvised his client about a matter material to the client's decision to enter into a plea agreement. *See* 407 F.3d at 1016 ("[C]ounsel made an affirmative representation to Kwan that

he had knowledge and experience regarding the immigration consequences of criminal convictions; as a result, counsel had a professional responsibility to [correctly] inform himself and his client . . . ."). Thus, while *Padilla* clearly abrogated *Kwan* to the extent that *Kwan* reaffirmed the rule in *Fry*, *see Kwan*, 407 F.3d at 1015, *Kwan*'s holding that affirmative misrepresentations by counsel regarding immigration consequences constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), clearly survives *Padilla*.

## B.  Whether *Chaidez* controls *Kwan*

We next turn to the government's argument that *Kwan* is controlled by *Chaidez*.  The government contends that for the same reasons *Chaidez* concluded *Padilla* announced a new rule and was not retroactive, *Kwan* must also have announced a new rule and not be retroactive.  Because we find *Kwan* sufficiently distinguishable from *Padilla*, we conclude *Kwan* is not controlled by *Chaidez*.

In *Chaidez*, the Supreme Court held that *Padilla* did not have retroactive effect.  133 S. Ct. at 1105.  In evaluating *Padilla* under the *Teague* framework, the Court explained that *Padilla* had not simply applied the "general standard" for IAC in *Strickland*, but rather "did something more."  *Chaidez*, 133 S. Ct. at 1107, 1108.  That "something more" was answering a threshold question: whether Sixth Amendment protections governing the competence of defense counsel extended to advice regarding deportation.  *Id.*  In concluding that they did, the Court answered in part a question left explicitly open in *Hill v. Lockhart*, 474 U.S. 52 (1985), whether the Sixth Amendment covered so-called "collateral consequence[s]" of a conviction.  *Chaidez*, 133 S. Ct. at 1108

(citing *Hill*, 474 U.S. at 60). Importantly, as we noted above, the Court answered this question in *Padilla* by rejecting the direct/collateral consequence distinction, declining to label deportation as either and, instead, identifying it as "unique." *Id.* at 1110 (quoting *Padilla*, 130 U.S. at 365) (internal quotation marks omitted). As such, *Padilla* fundamentally altered Sixth Amendment jurisprudence in at least partially breaking down the distinction between direct and collateral consequences. *Id.* at 1110–11.

*Kwan*'s much narrower holding instead focused on whether counsel's performance was deficient. *See* 407 F.3d at 1015–17. *Kwan* did not assert *Padilla*'s holding that attorneys could be liable for failing to advise about adverse immigration consequences; rather, *Kwan* merely held that attorneys' affirmative misrepresentations—or incorrect answers to direct questions from clients—regardless of their subject matter would be deficient performance under *Strickland*. *Id.* Thus, *Kwan*'s analysis rested on the distinction between failure to advise and affirmative misadvice, not on the direct/collateral/unique nature of the consequence faced by the petitioner. While there is some language in *Chaidez* that appears to cover both failure to advise and affirmative misrepresentations, *see* 133 S. Ct at 1110 ("*Padilla* . . . made the *Strickland* test operative . . . when a criminal lawyer gives (or fails to give) advice about immigration consequences."), *Chaidez* also recognized that prior to *Padilla*, certain circuits "recognized a separate rule for material misrepresentations," which "lived in harmony with" other precedent excluding claims based on failure to advise, *id.* at 1112.

Because *Chaidez* focused on the novelty of *Padilla*'s threshold inquiry as to whether the Sixth Amendment ever

applies to advice regarding deportation advice—an analysis absent from *Kwan*—we conclude that *Kwan* is not controlled by *Chaidez* and thus proceed with our own analysis of *Kwan* under *Teague*.

**C.  *Kwan* Under the *Teague* Framework**

Lastly, we must determine whether, as the district court concluded and the government argues, *Kwan* constituted a new rule of criminal procedure under *Teague* and thus cannot be applied retroactively.  We agree with Chan that *Kwan* did not establish a new rule under *Teague*, and we reverse the district court on that basis.

The framework we proceed under to determine retroactivity under *Teague* is clear:  first,[2] we determine "the date upon which the defendant's conviction became final." *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997).  Second, we "survey the legal landscape as it then existed and determine whether a . . . court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution."  *Id.* (internal quotation marks, brackets and citations omitted).  Finally, if the rule is a "new rule," we must determine "whether the relief sought falls within one of the two narrow exceptions to nonretroactivity." *Id.*

---

[2] Of course, there is a threshold determination as to whether the rule presented is "a substantive rule or a procedural rule" as "'*Teague* by its terms applies only to procedural rules.'"  *Hayes v. Brown*, 399 F.3d 972, 982 (9th Cir. 2005) (en banc) (quoting *Bousley v. United States*, 523 U.S. 614, 620 (1998)).  Neither party has argued that the rule in this case is substantive, and we conclude that because it "does not affect the scope of a substantive criminal statute," the rule here is clearly procedural.  *See id.*

In this case, Chan's conviction became final in 2000. Accordingly, we are required to "survey the legal landscape" at that time to determine whether Chan would have been vindicated in seeking to apply the rule in *Kwan* to her case.

"[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Chaidez*, 133 S. Ct. at 1107 (quoting *Teague*, 489 U.S. at 301) (internal quotation marks omitted). Further, "a holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" *Id.* (quoting *Lambrix*, 520 U.S. at 527–28). However, "'[w]here the beginning point' of [the court's] analysis is a rule of 'general application . . . designed for . . . evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule.'" *Id.* (first alteration in original) (quoting *Wright v. West*, 505 U.S. 277, 309 (1992) (Kennedy, J., concurring)).

We find that many factors weigh in favor of concluding that *Kwan* did not announce a new rule of criminal procedure. First, the language of both *Chaidez* and *Padilla* indicates that a court would not be creating a new rule by holding only that defense counsel's affirmative misrepresentations regarding immigration consequences could constitute an IAC claim. In response to Justice Sotomayor's dissent in *Chaidez*, which argued that *Padilla* itself was not a new rule based on cases such as *Kwan*, *Chaidez*, 133 S. Ct. at 1118 (Sotomayor, J., dissenting), the *Chaidez* majority explained that "those decisions reasoned only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his

client on any important matter, however related to a criminal prosecution," *id.* at 1112 (majority op.). The Court described the rule barring affirmative misrepresentations under *Strickland*—"regardless whether they concerned deportation or another collateral matter"—as a "limited" rule, which, it concluded, did not apply to Chaidez's failure-to-advise case. *Id.* Finally, the *Chaidez* majority noted that "*Padilla* would not have created a new rule had it only applied *Strickland*'s general standard to yet another factual situation—that is, had *Padilla* merely made clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent." *Id.* at 1108. Justice Sotomayor explained that "[t]he majority believes that [*Kwan* and related cases] did not meaningfully alter the state of the law in the lower courts before *Padilla*, because they merely applied the age-old principle that a lawyer may not affirmatively mislead a client." *Id.* at 1119 (Sotomayor, J., dissenting).

The distinction between affirmative misrepresentations and failure to advise also is reflected in *Padilla*. There, the Solicitor General argued that the Court should adopt a more narrow rule, similar to *Kwan*, whereby counsel's performance would only be deficient under *Strickland* if the attorney gave "misadvice" about collateral/immigration consequences. Brief for United States as Amicus Curiae Supporting Affirmance, *Padilla v. Kentucky*, 559 U.S. 356 (2010) (No. 08-651), 2009 WL 2509223, *6–7, 22–25. Although the *Padilla* majority rejected this position, 559 U.S. at 369–74, Justice Alito advocated for the adoption of this narrower rule in his concurrence, *id.* at 384–87 (Alito, J., concurring). Justice Alito characterized the majority's rule as a "dramatic departure from precedent," a "major upheaval in Sixth Amendment law," and a "dramatic expansion of the scope of criminal defense counsel's duties under the Sixth

Amendment." *Id.* at 377, 383. By contrast, Justice Alito explained the Solicitor General's narrower rule would "not require any upheaval in the law." *Id.* at 386. He additionally noted that "the vast majority of the lower courts considering claims of ineffective assistance in the plea context have distinguished between defense counsel who remain silent and defense counsel who give affirmative misadvice." *Id.* (internal quotation marks and brackets omitted). Read together, *Chaidez* and *Padilla* thus strongly indicate that the Court would not have considered the rule in *Kwan* to be a new rule.

Second, at the time Chan's conviction became final there was ample support in federal courts for the *Kwan* rule. By 2000, both courts of appeals to reach the issue had concluded that affirmative misrepresentations regarding immigration consequences could support an IAC claim in certain circumstances. *See Downs-Morgan v. United States*, 765 F.2d 1534, 1540–41 (11th Cir. 1985); *United States v. Briscoe*, 432 F.2d 1351, 1353–54 (D.C. Cir. 1970). Additionally, many district courts had reached the same conclusion. *See, e.g.*, *United States v. Khalaf*, 116 F. Supp. 2d 210, 215 (D. Mass. 1999); *see also United States v. Abramian*, No. CR 02-00945 MMM, 2014 WL 2586666, at *5 (C.D. Cal. June 10, 2014) (compiling cases). Several of our sister circuits had also concluded that affirmative misrepresentations regarding parole consequences, also considered to be a "collateral consequence" of a conviction, could establish an IAC claim. *See James v. Cain*, 56 F.3d 662, 667–69 (5th Cir. 1995); *Holmes v. United States*, 876 F.2d 1545, 1551–53 (11th Cir. 1989); *Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir. 1988); *Strader v. Garrison*, 611 F.2d 61, 65 (4th Cir. 1979). As such, "the [*Kwan*] rule was indicated, and was awaiting an instance in which it would be

pronounced." *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014). Moreover, we need not cite to a particular pre-2000 case stating that affirmative misadvice constitutes IAC for *Kwan* to not be a new rule under *Teague* because *Kwan* merely asserted an "age-old principle" that attorneys can be held liable if they affirmatively misadvise their clients. *See Chaidez*, 133 S. Ct. at 1119 (Sotomayor, J., dissenting); *Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) (en banc) ("[A] rule needs to be announced for purposes of *Teague* only if it's new. What we have here is the antithesis of *Teague*—a rule so deeply embedded in the fabric of due process that everyone takes it for granted.").

Although we join our colleagues on the Second Circuit in finding pre-*Padilla* circuit precedent on affirmative misrepresentations to be retroactive, *see Kovacs*, 744 F.3d at 50–51, we acknowledge that our conclusion puts us at odds with the Seventh Circuit's ruling in *Chavarria v. United States*, 739 F.3d 360 (7th Cir. 2014). There, the Seventh Circuit rejected "affirmative misadvice . . . under pre-*Padilla* law" as a basis for an IAC claim for two reasons: "[F]irst, . . . the distinction between affirmative misadvice and non-advice was not a relevant factor in *Padilla*," and "[s]econd, the precedent, pre-*Padilla*, supporting the application of *Strickland* in this context is insufficient to satisfy *Teague*." *Id.* at 362.

We respectfully disagree with both of these points. First, while *Padilla* certainly breaks down the barrier between affirmative misrepresentations and failure to advise—at least as to deportation advice—henceforth, Justice Alito's concurrence and *Chaidez* strongly suggest that the impact of *Padilla* would have been far different had the Supreme Court simply adopted the narrower *Kwan* rule. As such, while the

distinction may be "irrelevant" for *future* IAC claims, the distinction is relevant for our *Teague* analysis above. Second, as we explain above, we find ample support in the federal courts pre-*Padilla* for the rule that affirmative misrepresentations regarding immigration consequences could support IAC claims. As *Chaidez* noted, *Kwan* and similar cases "existed happily with precedent" that denied IAC claims based on failure to advise. 133 S. Ct. at 1112.

Ultimately, we read the language in *Chaidez* differently than the Seventh Circuit did in *Chavarria*, and we agree with the Second Circuit's analysis in *Kovacs*. We thus conclude that *Kwan* did not announce a new rule of criminal procedure under *Teague* and that the rule in *Kwan*—affirmative misrepresentations by defense counsel regarding immigration consequences is deficient under *Strickland*—can support Chan's IAC claim.

## IV. Conclusion

The district court dismissed Chan's petition because it concluded that *Kwan* was a new rule of criminal procedure under *Teague* and did not apply retroactively. Because we conclude otherwise, we reverse the district court's dismissal. However, the district court did not consider the merits of Chan's petition because it was dismissed on this ground alone. Accordingly, we remand the case to the district court to evaluate the merits of Chan's petition in the first instance.

**REVERSED and REMANDED.**

BYBEE, Circuit Judge, concurring:

I concur in Judge Nelson's majority opinion that our prior decision in *United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005), did not create a new rule under *Teague*. For reasons Judge Nelson explains, the duty under *Strickland v. Washington*, 466 U.S. 668 (1984), not to make affirmative misrepresentations (whatever their subject matter) is not "new." But in my view, we should reverse the district court for an independent reason, one that I find even more compelling than applying *Teague*: We granted coram nobis relief in *Kwan*, and Chan's coram nobis petition is on all fours with *Kwan*. This case is governed by *stare decisis*.

In order to grant coram nobis, we must find the error alleged to be "of the most fundamental character, that is, such as [would] render[] the proceeding itself invalid." *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987) (internal quotation marks omitted) (quoting *United States v. Mayer*, 235 U.S. 55, 69 (1914)). When we granted coram nobis relief to Kwan, we determined that counsel's affirmative misrepresentation regarding Kwan's immigration consequences constituted an "error . . . of the most fundamental character." *Kwan*, 407 F.3d at 1011–12 (quoting *Estate of McKinney ex. rel. McKinney v. United States*, 71 F.3d 779, 781–82 (9th Cir. 1995)). The Supreme Court has held that such fundamental errors exist only in "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" *United States v. Denedo*, 556 U.S. 904, 911 (2009) (quoting *United States v. Morgan*,

346 U.S. 502, 511 (1954)).[1]  If an error is so fundamental as to warrant coram nobis relief, doesn't that mean that the principle is not new?  Or put differently, is a finding of "fundamental error" for coram nobis purposes automatically "not-new" for *Teague* purposes because of its fundamental status?  I think the answer to both questions must be yes.

Under *Teague*, a case "announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."  *Teague v. Lane*, 489 U.S. 288, 301 (1989).  Such "a holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists'" at the time that the defendant's conviction became final. *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527–528 (1997)).  It seems obvious to me that an error of such fundamental character as to warrant coram nobis relief is one that all reasonable jurists would agree is an error.

Although I think the principle is obvious, neither the Supreme Court nor we have spoken to whether we must apply *Teague* where the case establishing the rule was an action in

---

[1] Historically, we have granted coram nobis relief only in very extreme and narrow circumstances.  *See, e.g.*, *United States v. McClelland*, 941 F.2d 999, 1001–02 (9th Cir. 1991) (granting coram nobis relief where defendant had been convicted without proof beyond a reasonable doubt of an essential element of the offense); *United States v. Walgren*, 885 F.2d 1417, 1423–24 (9th Cir. 1989) (finding fundamental error where Walgren's mail fraud conviction rested upon a commission of fraud that was not criminal); *Hirabayashi*, 828 F.2d at 608 (granting coram nobis relief to vacate Hirabayashi's convictions for failure to report under the Civilian Exclusion Order 57 and for a wartime curfew violation, convictions which were later deemed unjust by both the legislative and executive branches).

coram nobis. *Cf. id.* at 1106 n.1 (assuming without deciding that there was no meaningful difference between a coram nobis petition and a habeas petition in determining whether *Padilla* had retroactive effect under *Teague*). In *Chaidez*, the Court decided whether a prior, non-coram nobis case applied retroactively for the benefit of the coram nobis petitioner. *Id.* at 1106, 1110–11. In that case, using *Teague* to decide whether the error was so obvious to be "fundamental" makes sense. By contrast, here we have a coram nobis petitioner seeking to use a prior *coram nobis* case retroactively for her own relief.

Chan's case is distinguishable from the principal decision noted by the dissent, *Ortega v. Roe*, for the same reason. See Dissent at 25–26. In *Ortega* (a 28 U.S.C. § 2254 habeas and pre-AEDPA case), we considered whether a habeas petitioner could rely on our decision in *United States v. Stearns* (a § 2255 case) for his own habeas relief, and we conducted a *Teague* analysis of *Stearns*. *Ortega v. Roe*, 160 F.3d 534, 535–36 (9th Cir. 1998) (citing *United States v. Stearns*, 68 F.3d 328, 329 (9th Cir. 1995)), *vacated on other grounds by Roe v. Flores-Ortega*, 528 U.S. 470 (2000). It makes sense that we would conduct a *Teague* analysis in *Ortega* because *Stearns* treated the Sixth Amendment question before it as a straight-up *Strickland* question. In *Stearns*, we did not have to conclude that the petitioner's proceedings exhibited an "error of the most fundamental character." Accordingly, it makes sense to require a petitioner—whether proceeding under § 2254, § 2255, or coram nobis—who is seeking the benefit of a decision made retroactive in a prior *habeas* case, to satisfy *Teague*'s "new rule" analysis. But not so here. We have already held the error in Chan's case to be "of the most fundamental character," and it strikes me as illogical to require her to repeat the same arguments for the purposes of

satisfying *Teague*. We need not use *Teague* to decide if we find an error to be "fundamental" when *Kwan* has already so concluded. This case turns out to be a straightforward application of *stare decisis*.

I would reverse the district court's order dismissing Chan's petition because we are bound by *Kwan*'s finding of "fundamental error" and its implicit holding that it was not creating a new rule under *Teague*.

IKUTA, Circuit Judge, dissenting:

As the Supreme Court made clear, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final. And a holding is not so dictated . . . unless it would have been apparent to all reasonable jurists." *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013) (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989) and *Lambrix v. Singletary*, 520 U.S. 518, 527–28 (1997)) (internal quotation marks and citation omitted). Relying on our precedents and those of other circuits, we held in 2003 that counsel's failure to advise a defendant of collateral immigration consequences of a criminal conviction did not violate the Sixth Amendment. *See United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003), *abrogated by Padilla v. Kentucky*, 559 U.S. 356 (2010). As indicated in *Chaidez*, reasonable jurists would have interpreted that rule to mean that *Strickland v. Washington*, 466 U.S. 668 (1984), was simply not "operative" and did not apply "when a criminal lawyer gives (or fails to give) advice about immigration consequences." *Chaidez*, 133 S. Ct. at 1110. In 2005, we made an exception to this general rule,

and held that *Strickland does* apply to a lawyer's affirmative misadvice about immigration consequences. *United States v. Kwan*, 407 F.3d 1005, 1015 (9th Cir. 2005), *abrogated in part by Padilla*, 559 U.S. 356. Because this exception was not dictated by precedent, *Kwan* established a new rule. In order to reach the opposite conclusion, the majority adopts the reasoning of the dissent in *Chaidez*. Maj. Op. at 10–12, 14. Because I think we should follow the Supreme Court's majority, not the dissenters, I decline to go along.

I

Before pleading guilty to three counts of perjury in 2000, Maureen Chan asked her attorney about the immigration consequences of her plea. According to Chan, the attorney told her that there would be no adverse immigration consequences. In 2012, the Department of Homeland Security initiated removal proceedings against Chan, charging her as being inadmissible under 8 U.S.C. § 1182(a)(2)(A)(i)(I) as an alien convicted of a crime involving moral turpitude. Chan brought a petition for writ of error coram nobis, seeking to withdraw her guilty plea on the ground that her counsel in 2000 gave her ineffective assistance by misadvising her of the immigration consequences of her plea. She claims that the exception stated in *Kwan* applies retroactively to her conviction in 2000.

If *Kwan* created a new rule, it cannot be applied retroactively to cases on collateral review. *See Teague*, 489 U.S. at 307, 310. Our reasoning in *Fry* indicates that our pre-*Kwan* precedent did not dictate the result in *Kwan*, and such a result would not have been apparent to all reasonable jurists at the time of Chan's conviction. *See Chaidez*, 133 S. Ct. at 1107. In *Fry*, we considered whether a habeas

petitioner's claim that his Sixth Amendment right to effective assistance of counsel was violated when his counsel failed to inform him that he could be deported if convicted. 322 F.3d at 1199–1200. *Fry* pointed to our long-standing precedent that "deportation is a collateral, not direct, consequence of the criminal process," *id.* at 1200 (citing *Fruchtman v. Kenton*, 531 F.2d 946, 949 (9th Cir. 1976)), and that failure to advise a defendant of collateral consequences is not ineffective assistance of counsel, *id.* (citing *Torrey* v. *Estelle*, 842 F.2d 234, 237 (9th Cir. 1988)). Citing cases from the First, Second, Fifth, Fourth, Seventh, Tenth, Eleventh and D.C. Circuits, *Fry* also noted that "[a]ll other circuits to address the question have concluded that deportation is a collateral consequence of the criminal process and hence the failure to advise does not amount to ineffective assistance of counsel." *Id.* (internal quotation marks omitted). *Fry* concluded, consistent with both Ninth Circuit precedent and our sister circuits, "that counsel's failure to advise a defendant of collateral immigration consequences of the criminal process does not violate the Sixth Amendment right to effective assistance of counsel." *Id. Fry* did not suggest there was any distinction between lack of advice about deportation and misadvice about deportation. Nor would it have been apparent to all reasonable jurists that we intended such a distinction, given the general principle (subsequently spelled out by the Supreme Court) that "there is no relevant difference between an act of commission and an act of omission" for purposes of ineffective assistance of counsel, and thus a lawyer's advice includes a lawyer's "affirmative misadvice." *Padilla*, 559 U.S. at 370.

By concluding that the petitioner could not raise an ineffective assistance of counsel claim because deportation is a collateral consequence of the criminal process, *Fry*

effectively recognized, in keeping with our sister circuits, that "advice about matters like deportation, which are 'not a part of or enmeshed in the criminal proceeding,' does not fall within the [Sixth] Amendment's scope." *Chaidez*, 133 S. Ct. at 1109 (quoting *United States v. George*, 869 F.2d 333, 337 (7th Cir. 1989)). This conclusion derives from the more general principle that if a defendant has no constitutional right to effective assistance of counsel with respect to a collateral matter, an attorney's error with respect to such a matter could not violate the defendant's Sixth Amendment right. *Cf. Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991) (where there is no constitutional right to counsel, there is no deprivation of effective assistance regardless whether the attorney makes a serious error in representing the client). Accordingly, before *Kwan* was decided, a reasonable jurist could conclude that an attorney's "advice about collateral matters" was "excluded . . . from the Sixth Amendment's ambit," and therefore *Strickland* did not apply "when a criminal lawyer gives (or fails to give) advice about immigration consequences." *Chaidez*, 133 S. Ct. at 1110. Indeed, nothing in our case law would have precluded us from reaching such a conclusion.

We decided to take a different approach. In 2005, *Kwan* distinguished *Fry* and held for the first time that *Strickland* applied to an affirmative misrepresentation regarding immigration consequences. *See Kwan*, 407 F.3d at 1015 (citing *United States v. Couto*, 311 F.3d 179, 187–88 (2d Cir. 2002)). While other circuits had reached this conclusion as well, no Ninth Circuit case had previously adopted this exception to the collateral consequences rule.

Did *Kwan* announce a new rule? *Chaidez* strongly indicates it did so. As explained in *Chaidez*, making an

exception to the collateral consequences rule that advice regarding deportation is "'categorically removed' from the scope of the Sixth Amendment right to counsel," 133 S. Ct. at 1108, requires a court to breach "the previously [fissure]-free wall between direct and collateral consequences" and establish that *Strickland* did apply to claims of ineffective assistance of counsel relating to deportation matters, *id.* at 1110. Such a breach in the wall between direct and collateral consequences constitutes "'breaking new ground' or 'imposing a new obligation,'" and therefore creates a new rule that is not retroactively applicable. *Id.* (alterations omitted). In reaching this conclusion, *Chaidez* rejected the defendant's argument that a breach in the wall between direct and collateral consequences (made by *Padilla*) did not constitute a new rule because it "did no more than apply *Strickland* to a new set of facts." *Id.* at 1111. Rather, the Court explained, before considering the applicability of *Strickland*, *Padilla* had to determine "whether *Strickland* applied at all." *Id.* at 1110.

We should reach the same conclusion here. Because we adopted the collateral consequences rule based on our long-standing precedent, *see Fry*, 322 F.3d at 1200, a jurist could reasonably conclude that *Strickland* didn't apply at all to "a lawyer's advice (or non-advice) about a plea's deportation risk," *Chaidez*, 133 S. Ct. at 1110. Two years later, *Kwan* created a "separate rule," *id.* at 1112, by distinguishing *Fry* and holding that the Sixth Amendment applied to affirmative misadvice by counsel regarding the collateral matter of deportation, *see Kwan*, 407 F.3d at 1015–17. As explained in *Chaidez*, such a rule had to first breach "the previously [fissure]-free wall between direct and collateral consequences" and establish that *Strickland* applied to collateral deportation matters, when the attorney gives

affirmative misadvice. *Chaidez*, 133 S. Ct. at 1110. *Kwan*'s exception was not dictated by *Strickland*, because *Kwan* first had to reach the conclusion that "*Strickland* applied at all." *Id*. Accordingly, we should conclude that *Kwan* was not the mere application of *Strickland*, but rather created a new rule that is not retroactively applicable. *See Teague*, 489 U.S. 288.

II

The majority's arguments regarding why *Kwan* did not create a new rule are not persuasive. Like the defendant in *Chaidez*, Chan and the majority here argue that *Kwan* was a simple application of *Strickland.* Maj. Op. at 11–12. But this is the very argument rejected by *Chaidez*. Indeed, in concluding that *Kwan* was just an application of *Strickland*, the majority is forced to rely on the language of *Chaidez*'s *dissent*. Maj. Op. at 14 (quoting *Chaidez*, 133 S. Ct. at 1119 (Sotomayor, J., dissenting)) ("*Kwan* merely asserted an 'age-old principle' that attorneys can be held liable if they affirmatively misadvise their clients.").

Second, the majority argues that *Kwan*'s rule is not new because it can be retrospectively supported by *Strickland*. Maj. Op. at 11–12. Of course at some level of generality even a new rule can be justified by reference to prior case law. *See, e.g.*, *Saffle v. Parks*, 494 U.S. 484, 489–90 (1990) (concluding that extending the reasoning of two prior cases resulted in the creation of a new rule). But the correct inquiry is whether the *Kwan* rule was *dictated* by our precedent, *see Teague*, 489 U.S. at 301, and the majority cites no Ninth Circuit cases that would suggest that all reasonable jurists at the time of Chan's conviction would predict the announcement of a rule that affirmative misadvice about

immigration consequences would be exempt from the firm barrier that existed between direct and collateral consequences. *See Chaidez*, 133 S. Ct. at 1110. Rather, a jurist could have reasonably concluded that an attorney's error with respect to collateral immigration matters was simply outside the scope of the Sixth Amendment.

Finally, the majority defends its position that *Kwan* did not create a new rule by pointing to the other circuits and out-of-circuit district courts that had adopted a similar exception for affirmative misrepresentations prior to *Kwan*. Maj. Op. at 13–14. But *Chaidez* made clear that the fact that "a minority of courts recognized a separate rule for material misrepresentations," *Chaidez*, 133 S. Ct. at 1112, was insufficient to establish that all reasonable jurists would have concluded that the Sixth Amendment applied to the collateral consequence of deportation, *id*. In other words, the existence of these out-of-circuit decisions does not establish that all reasonable Ninth Circuit judges, "prior to [*Kwan*], thought they were living in a [*Kwan*]-like world." *Id*. As noted above, we had adopted the collateral consequences rule, *see Fry*, 322 F.3d at 1200–01, and made no mention of the separate material misrepresentation rule later adopted in *Kwan*. More to the point, *Chaidez* indicates that the exception to the collateral consequences rule that *Kwan* ultimately adopted constituted a "separate rule," not simply an application of *Strickland*. 133 S. Ct. at 1112.

III

The concurrence similarly misses the mark in concluding that when a court announces a rule in the course of deciding a coram nobis petition, that rule is binding on all subsequent coram nobis petitions. This argument is in tension with our

case law, which properly adheres to *Teague.* Thus in *Ortega v. Roe*, rather than apply a rule announced in a prior habeas case without considering whether that rule existed at the time Ortega's conviction became final, we instead considered whether the rule was in fact "new," as defined by *Teague*. *See* 160 F.3d 534, 536 (9th Cir. 1998), *vacated on other grounds by Roe v. Flores-Ortega*, 528 U.S. 470 (2000). This same approach would apply in coram nobis proceedings, because in determining whether a rule applies retroactively, we do not distinguish between habeas and coram nobis. *See United States v. McClelland*, 941 F.2d 999, 1002 (9th Cir. 1991); *United States v. Walgren*, 885 F.2d 1417, 1421 (9th Cir. 1989).

Finally, the concurrence's argument that *any* rule announced in the course of deciding a coram nobis petition must be applied to subsequent coram nobis cases is contrary to *Teague*, which made clear that a new rule may be applied retroactively to cases on collateral review only "if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" or "if it requires the observance of 'those procedures that . . . are implicit in the concept of ordered liberty.'" 489 U.S. at 307, 310, quoting *Mackey v. United States*, 401 U.S. 667, 692–93 (1971) (Harlan, J., concurring). Not all new rules in coram nobis cases will pass such a high bar, and the rule announced in *Kwan* does not come close. Of course, the question whether a rule announced in a federal habeas or coram nobis proceeding is a "new rule" should seldom arise, since the Supreme Court has banned using habeas corpus (and by extension, other collateral proceedings such as coram nobis) to create new constitutional rules of criminal procedure unless the rules meet the two exceptions described in *Teague*. *See* 489 U.S. at 316. But as explained

above, *Chaidez* requires us to conclude that the rule announced in *Kwan* was a new rule, and therefore we must comply with *Teague* in considering whether it is applicable here.

IV

Although Chan's case is sympathetic, the result in *Kwan* "was not *dictated* by precedent existing at the time [Chan's] conviction became final" and would not "have been apparent to all reasonable jurists." *Chaidez*, 133 S. Ct. at 1107 (internal quotation marks omitted). As such, *Kwan* created a new rule and cannot be applied retroactively to Chan's case. *See Teague*, 489 U.S. at 301, 310. I would affirm the district court.